IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOHN N. OGDEN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )     **Civil No. 15-cv-307-CJP**[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff John N. Ogden is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in January 2012, alleging disability beginning on April 20, 2011. (Tr. 10).   After holding an evidentiary hearing, ALJ Lee Lewin denied the application for benefits in a decision dated November 20, 2013.   (Tr. 10-21).   That decision is the final decision of the Commissioner subject to judicial review.   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Doc. 11.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in rejecting the opinion of Dr. Young.

2. The ALJ failed to explain the evidentiary basis for her conclusion that plaintiff could frequently handle bilaterally, and failed to include limitations caused by sleep apnea.

3. The ALJ's credibility analysis was legally insufficient.

4. The ALJ failed to explain how she determined that plaintiff could perform his past work as an employment interviewer.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  For a DIB claim, a claimant must establish that he was disabled as of his date last insured.  *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §423(d)(3).  "Substantial gainful activity" is work activity that involves doing

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.

2

significant physical or mental activities, and that is done for pay or profit.  20

C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in
> substantial gainful activity. The second step evaluates whether an
> alleged physical or mental impairment is severe, medically
> determinable, and meets a durational requirement. The third step
> compares the impairment to a list of impairments that are considered
> conclusively disabling. If the impairment meets or equals one of the
> listed impairments, then the applicant is considered disabled; if the
> impairment does not meet or equal a listed impairment, then the
> evaluation continues. The fourth step assesses an applicant's residual
> functional capacity (RFC) and ability to engage in past relevant work. If
> an applicant can engage in past relevant work, he is not disabled. The
> fifth step assesses the applicant's RFC, as well as his age, education,
> and work experience to determine whether the applicant can engage in
> other work. If the applicant can engage in other work, he is not
> disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is

presently unemployed; (2) whether the claimant has an impairment or combination

of impairments that is serious; (3) whether the impairments meet or equal one of

the listed impairments acknowledged to be conclusively disabling; (4) whether the

claimant can perform past relevant work; and (5) whether the claimant is capable of

performing any work within the economy, given his or her age, education and work

experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th

Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be

found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th   Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Mr. Ogden was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this

Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Lewin followed the five-step framework described above.   She determined that Mr. Ogden had not been engaged in substantial gainful activity since the alleged onset date, and that he was insured for DIB through June 30, 2015.   She found that plaintiff had severe impairments of degenerative disc disease of the cervical, thoracic and lumbar spine; partial thickness tear of the left rotator cuff; OSA; COPD; chronic sinusitis; and bilateral carpal/cubital tunnel syndrome.   She further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found plaintiff had the residual functional capacity to perform work at the light exertional level with some physical limitations.   Relative to his upper extremities, the ALJ determined that he was limited to no overhead lifting, occasional reaching in all other directions with the left upper extremity, and frequent but not repetitive handling bilaterally.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do his past work as an employment interviewer as that work is generally performed.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in

formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

**1.    Agency Forms**

Plaintiff was born in 1949, and was almost 62 years old on the alleged onset date of April 20, 2011.   (Tr. 153).

In his initial Disability Report, plaintiff said he was unable to work because of his neck and back.   He had worked as a case manager for an employment agency and as a repairman in a coal mine.   (Tr. 157-158).

In a Function Report submitted in February 2012, plaintiff said he had constant pain radiating from his neck across his left shoulder blade and down into his left arm.   He needed to lie down periodically during the day.   He lived alone. He did housework but it took him a long time.   He was able to lift ten to fifteen pounds, and reaching out or up aggravated his neck and arm pain.   (Tr. 164-178).

In June 2012, plaintiff reported that he had breathing problems and had been diagnosed with COPD.   He also suffered from chronic sinusitis.   (Tr. 194).

**2.    Evidentiary Hearing**

Mr. Ogden was represented by an attorney at the hearing.   (Tr. 64).

Plaintiff testified that he occasionally hunted turkey near his house and went fishing.   He cleaned the turkeys and fish that he caught.   (Tr. 72-76).   He lived alone and did housework and cooking, but did thing in stages.   (Tr. 70-72).   He walked three days a week for a half of a mile to a mile for exercise.   (Tr. 77).   He tried to do his chores in the morning because he felt better then.   (Tr. 78).

Plaintiff said he was unable to work because he could not function for a whole workday.   His main problem is pain in his neck which travels across his shoulder blade and down his left arm.   (Tr. 82).   He was injured at work in April 2011.   He made a workers' compensation claim, and then retired in early 2012.   (Tr. 81).

Mr. Ogden was taking only ibuprofen.   He tried to manage his pain by resting and getting in a horizontal position.   He had gone to a pain management doctor who prescribed Neurontin and other medications, but they caused him stomach problems.   (Tr. 86-87).

Plaintiff also had carpal tunnel and cubital tunnel problems.   He had pain in his wrists and elbows.   He could not use a computer for very long.   He had recently seen Dr. Young, who recommended surgery.   A firm date had not been set, but it was probably going to be done in December of 2013.   (Tr. 87-89).

A vocational expert (VE) also testified.   She testified that plaintiff's prior work as an employment interviewer corresponded to DOT code 166.267-010.   It was classified as a sedentary job, but was performed by plaintiff at the light exertional level.   The ALJ asked her a series of hypothetical questions.   One question corresponded to the ultimate RFC findings, that is, a person of plaintiff's age and work experience who was able to do work at the light exertional level, with no climbing of ladders, ropes or scaffolds, only occasional climbing of ramps and stairs, only occasional kneeling, stooping and crouching, and limited to frequent but not repetitive handling and frequent lifting overhead with the bilateral upper extremities.   The VE testified that this person would be able to do plaintiff's past work as an employment interviewer as that work is generally performed.   He

7

would not be able to do it as plaintiff performed the job because plaintiff indicated in Exhibit 4E that he was handling (writing with small objects) constantly.   If the person were limited to occasional, rather than frequent, handling, he would be unable to do plaintiff's past work.   (Tr. 99-103).

### 3.   Medical Treatment

Mr. Ogden was treated at WorkCare Occupational Health following a work injury in April 2011.   The initial diagnoses were acute left lateral trapezius/left shoulder and left upper arm triceps strains, pains, spasms, and acute left rotator cuff tendinopathy.   (Tr. 243).

On June 14, 2011, an MRI of the cervical spine showed no acute injury. There was discogenic and degenerative joint disease at multiple levels with some foraminal stenosis but no central canal stenosis.   Plaintiff also had bilateral maxillary sinus disease.   (Tr. 231-232).

An MRI of the left shoulder showed multiple work-related injuries.   Mr. Ogden was referred to an orthopedic specialist for further care.   (Tr. 239).

Dr. Treg Brown, an orthopedic specialist, saw plaintiff on July 5, 2011.   He diagnosed a probable partial thickness supraspinatus tear, impingement syndrome and AC arthrosis.   Dr. Brown recommended physical therapy and continued use of Relafen, a nonsteroidal anti-inflammatory drug.   (Tr. 263-264).

In July 2011, an ultrasound of the left shoulder confirmed that plaintiff had a partial thickness supraspinatus tear.   (Tr. 265).

In August 2011, Dr. Brown wrote that this was a "confusing clinical scenario" and that he felt that some of plaintiff's problems were caused by his neck.   He was

continued on light duty and encouraged to see another doctor regarding his neck. (Tr. 266).   The next month, plaintiff told Dr. Brown that he had seen a physiatrist for his neck.   That doctor gave him an interarticular injection of cortisone.   The doctor's note said this gave plaintiff 80% relief, but plaintiff said it was not that significant.   On exam, there was no warmth or swelling in the shoulder.   Forward elevation and internal rotation were slightly decreased.   He had 3/3 impingement signs and some slight weakness of the supraspinatus.   (Tr. 267).

In December 2011, plaintiff saw Dr. Robert Vraney, an orthopedic specialist, regarding his neck pain.   Dr. Vraney noted that the symptoms in plaintiff's left arm had resolved.   On exam, he had a little tenderness to the left side of the cervical vertebral prominence and "perhaps a little bit of soreness along the medial border of the scapula."   He had full range of motion and good strength in the upper extremities.   He had good sensation in the upper extremities.   The assessment was cervicalgia.   Dr. Vraney reviewed his cervical MRI and x-rays.   He concluded that there was not "anything particularly worrisome here."   He noted that the MRI findings were "very nonspecific" and that there was no indication for surgery.   He recommended only some neck exercises.   He had "no specific restrictions to suggest."   (Tr. 373-374).

Dr. Treg Brown released plaintiff to return to medium work on December 6, 2011.   (Tr. 270).   On February 7, 2012, Dr. Brown concluded that Mr. Ogden had reached maximum medical improvement with regard to his left shoulder injury. Range of motion testing showed that forward elevation was about 20 degrees less than on the right, and external rotation was the same as on the right.   Internal

9

rotation was to the level of T6.   He had excellent infraspinatus and subscapularis strength, but still had some reduction of supraspinatus against resistance and positive Hawkins sign.   The impression was left shoulder impingement.   Dr. Brown noted that there was some overlap with plaintiff's neck condition.   He recommended a functional capacity exam as plaintiff felt he was unable to return to his normal job duties.   (Tr. 271).

Dr. Richard Kube of Prairie Spine and Pain Institute began seeing plaintiff for his neck problems in February 2012.   At the first visit, physical exam showed good range of motion of the neck with no tenderness on palpation.   Strength in the left upper extremity was normal.   He had subjective paresthesia of the dermatome C6-7 on the left.   Dr. Kube reviewed the MRI findings and noted there was some disc protrusion at that level.   He recommended an EMG.   (Tr. 308-311).

An EMG study was performed on February 20, 2012.   This study was consistent with left C7 radiculopathy.   It also showed evidence of mild bilateral carpal tunnel syndrome, left worse than right, and mild bilateral ulnar neuropathy at the elbow.   (Tr. 302-303).

Plaintiff was seen by a pulmonologist, Dr. Pineda, in June 2012.   Plaintiff told him that he had difficulty breathing, accompanied by a cough and sinus congestion about ten months earlier, but he was doing "quite well" at the time of the visit.   He walked on an elliptical machine for 30 minutes 3 times a week and had not had difficulty when he went turkey hunting.   Dr. Pineda concluded that plaintiff had COPD, but that he was asymptomatic.   He also had chronic sinusitis, for which his family doctor prescribed Flonase and Singulair.   Dr. Pineda

10

recommended that he continue with those medications.   (Tr. 425-428).

In September 2012, Dr. Adrian Feinerman performed a consultative physical examination at the request of the agency.   Mr. Ogden said that he had pain in his neck radiating into his left arm and pain in his low back radiating into his right leg. He also complained of pain in both shoulders.   Dr. Feinerman reported normal findings on physical exam.   In particular, there was a full range of motion of all segments of the spine and of all joints, including shoulders, elbows and wrists. Plaintiff had no difficulty in performing fine and gross manipulations, and his sensation was normal to vibration, light touch and pinwheel.   (Tr. 457-465).

In January 2013, plaintiff told his primary care physician that his upper back pain was worse.   He denied joint pain, numbness, trouble walking or tingling in the arms.   Dr. Muniz detected muscle spasms in the thoracic area.   He recommended change in posture and exercise.   (Tr. 480-483).   X-rays showed that the vertebral body and intervertebral disc heights were normal.   There was no fracture or subluxation.   There was moderate multilevel endplate osteophyte formation.   (Tr. 473).   Plaintiff saw Dr. Muniz four more times.   Those office notes contain no mention of back pain.   (Tr. 513-522, 598-606).

Mr. Ogden saw Dr. Fakhe Alam in July 2013 for sleep problems and cervical radiculopathy.   Plaintiff told Dr. Alam that he had been diagnosed with sleep apnea in 2001, but had been unable to tolerate a CPAP machine.   He had a history of four sinus surgeries.   He also complained of pain starting in his neck and going into his left shoulder and arm, and increased symptoms from carpal tunnel and ulnar neuropathy.   On exam, his neck was supple.   Strength in the upper extremities

was full, including grip strength.   Sensation was intact for pinprick, vibration and soft touch.   A repeat EMG showed left C7 nerve root irritability without frank radiculopathy, moderately severe bilateral ulnar neuropathy at the elbows, mild right carpal tunnel syndrome, and moderately severe left carpal tunnel syndrome. (Tr. 531-538).   In August 2013, Dr. Alam recommended that plaintiff's carpal tunnel and ulnar neuropathy be addressed before his cervical radiculopathy. Plaintiff told him he did not like to take pills and did not want any medication.   He referred plaintiff to Dr. Young and asked him to return in three months.   (Tr. 529).

Dr. Steven Young saw plaintiff on August 19, 2013.   Dr. Young practiced in the same office as Dr. Treg Brown, who had seen plaintiff previously.   Plaintiff complained of pain extending from the fingertips to the neck, worse on the left side. On exam, plaintiff was 6'1" tall and weighed 195 pounds.   Grip strength was 38 kg on the right and 32 kg on the left.[3]   Pinch was 6.5 kg on the right and 6.0 kg on the left.   The left elbow lacked a few degrees of full extension.   He could fully flex and extend his digits, and light touch was grossly intact.   Dr. Young evaluated his nerve conduction study and noted that it showed bilateral carpal tunnel syndrome and cubital tunnel syndrome, worse on the left.   He recommended a left carpal tunnel release and ulnar nerve transposition.   Mr. Ogden said that he wanted to "wait for later in the year before he has this done."   (Tr. 658-659).

Plaintiff returned to Dr. Kube in September 2013.   After examining plaintiff, Dr. Kube concluded that "He seems to have more pronounced cubital tunnel, some

---

[3] The mean grip strength in healthy males in plaintiff age range is 40 kg on the right and 38 kg on the left.   http://www.rehabmeasures.org/Lists/RehabMeasures/DispForm.aspx?ID=1185,   visited   on January 12, 2016.

carpal tunnel as well."   Dr. Kube recommended that plaintiff pursue treatment for his carpal and cubital tunnel syndrome "to see if this resolves most of his issues." (Tr. 663-665).

### 4.     Dr. Young's Opinion

Dr. Steven Young completed a form entitled Medical Source Statement of Ability to Do Work-Related Activities (Physical) on August 10, 2013.   (Tr. 660-662).   The only office note from Dr. Young is dated August 19, 2013.   (Tr. 658).

Dr. Young indicated that Mr. Ogden could occasionally lift and carry up to 20 pounds.   He could sit for a total of 3 hours a day and stand/walk for a total of 3 hours a day.   He needed to lay down for the rest of an 8 hour day.   He needed to be able to constantly change positions, and would need to take a 15 minute break every hour.   Dr. Young said that plaintiff could only occasionally (or less) reach, handle and push/pull with both upper extremities.   The form asked him to state why the patient was limited in this way.   He answered, "exacerbation with repetitive forceful gripping/lifting, etc."   He stated that he relied on the nerve conduction study/EMG for his conclusions.   He also stated that plaintiff had "substantial cervical spine pathology treated elsewhere."

## Analysis

Mr. Ogden first argues that the ALJ erred in not giving more weight to the opinion of Dr. Young.

The opinions of treating doctors are not necessarily entitled to controlling weight.   Rather, a treating doctor's medical opinion is entitled to controlling weight

only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record.   *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

20 C.F.R. §404.1527(c)(2) states, in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. **If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.** [Emphasis added]

Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability."   *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).   If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527.   Supportability and consistency are two important factors to be considered in weighing medical opinions.   In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record."   *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527.

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion.   *Myles v. Astrue*,

14

582 F.3d 672, 678 (7th Cir. 2009).   While she is not required to mention every piece of evidence, she "must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."   *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).   Further, she must give a "sound explanation" for her decision to reject a treating doctor's opinion.   *Roddy v. Astrue*, 705 F.3d 631, 637-638 (7th Cir. 2013).

Here, ALJ Lewin said only that she gave "little weight" to Dr. Young's opinion because "the extreme limitations found by Dr. Young are not supported by the results of clinical or functional examinations in the record, or by the claimant's activities of daily living, discussed above."   (Tr. 20).

Dr. Young is an orthopedic specialist.   He saw plaintiff for bilateral upper extremity complaints.   Based on physical examination and nerve conduction/EMG, he diagnosed bilateral carpal and cubital tunnel syndrome, worse on the left.   Dr. Young recommended that plaintiff undergo left carpal tunnel release and ulnar nerve transposition.   (Tr. 658-659).

ALJ Lewin did not specify which clinical or functional examinations contradicted Dr. Young's opinion.   In her brief, the Commissioner reviews the ALJ's summary of the medical evidence, and points out a number of examinations that, in her estimation, contradict Dr. Young's opinion.   However, most, if not all, of those examinations took place before the second EMG in July, 2013, which showed that Mr. Ogden's carpal tunnel and cubital tunnel syndrome had worsened in his left arm.   Further, the ALJ cites to Dr. Feinerman's exam, which showed no deficits, but the ALJ obviously rejected Dr. Feinerman's opinion because she

concluded that plaintiff does, in fact, have limitations.   See. Tr. 19.

The Commissioner also highlights the discrepancy between the date of Dr. Young's office note and the date on his report.   See, Doc. 20, p. 7.   The ALJ, however, made no mention of this discrepancy, and did not rely on it as a reason to discount Dr. Young's opinion.   The ALJ's decision cannot be upheld based upon the Commissioner's after-the-fact rationalization.   *Hughes v. Astrue*, 705 F.3d 276, 279 (7th Cir. 2013) ("Characteristically, and sanctionably, the government's brief violates the *Chenery* doctrine….."); *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision….").   In addition, the Commissioner's brief misstates the record; she argues that plaintiff "decided unilaterally to wait a year for the surgery."   Doc. 20, p. 7.   Plaintiff saw Dr. Young in August 2013, and told Dr. Young that he wanted to wait until "later in the year," not wait for a year, for surgery.   (Tr. 658-659).

The ALJ's failure to explain why she rejected Dr. Young's opinion was error, and that error requires remand.

The Court also agrees that the RFC assessment was not supported by substantial evidence.

Plaintiff argues that the ALJ created an "evidentiary deficit" by rejecting all of the medical opinions and then relying on her own independent medical determination to decide that plaintiff could frequently handle bilaterally.   He cites *Suide v. Astrue*, 371 F. Appx. 684 (7th Cir. 2010) in support.

*Suide* does not stand for the proposition that an ALJ's RFC assessment must

16

rest upon a healthcare provider's opinion.   The rule is, in fact, to the contrary. The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions. . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).   The determination of RFC is an administrative finding that is reserved to the Commissioner.   20 C.F.R. §404.1527(d)(2).   The error in *Suide* was not that the ALJ did not rely on a doctor's opinion to assess RFC; rather, the error was that the ALJ failed to discuss significant medical evidence in the record.   *Suide*, 371 Fed.Appx. at 690.

However, the Court agrees with plaintiff's argument that the ALJ made her own independent medical assessment of his ability to handle, and failed to build the required "logical bridge" between the evidence and her conclusion.

The ALJ did not explain the basis for her conclusion that plaintiff was limited to frequent, as opposed to occasional, handling.   The agency defines occasional as "occurring from very little up to one-third of the time." Frequent is defined as "occurring from one-third to two-thirds of the time."   SSR 83-10, 1983 WL 31251, *5-6.

The Commissioner argues that the limitation to frequent handling was supported by the medical evidence.   She argues that the ALJ noted that the MRI's showed only mild and moderate findings.   Doc. 20, p. 11.   Both the Commissioner and the ALJ are wrong on this point.   The second MRI showed *moderately severe* bilateral ulnar neuropathy and *moderately severe* left carpal tunnel syndrome.   (Tr. 531-538).   The ALJ got this right in reviewing the medical evidence (Tr. 18), but incorrectly described the results as "mild to moderate" in

17

discussing plaintiff's credibility at Tr. 19.   The Commissioner again argues that the ALJ cited plaintiff's decision to delay surgery for a year.   Doc. 20, p. 11.   This is incorrect; the ALJ accurately noted that plaintiff decided to wait until later in the year for surgery.   (Tr. 18).   As a practical matter, this was a delay of only a few months.   Notably, Mr. Ogden was not asked at the hearing why he wanted to delay the surgery.

The ALJ did not explain why she believed that a limitation to frequent, rather than occasional, handling was appropriate.   It is true that the ALJ summarized the medical records with respect to plaintiff's upper extremity complaints, but she did not explain how this evidence supported the limitation that she assessed.   This was error.   See, *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)("The ALJ needed to explain how she reached her conclusions about Scott's physical capabilities . . . .").

The difference between frequent and occasional use of the arms is potentially dispositive in this case because of Mr. Ogden's age and work history.   The VE testified that plaintiff's past work as an interviewer requires frequent handling.   If he were limited to occasional handling, he could not do that job.   If the analysis proceeded to Step 5, plaintiff would be deemed disabled.   The VE testified that, because of plaintiff's age, the Grids would dictate a finding of disabled even if he were able to perform a full range of light work.   (Tr. 102-103).   The VE's testimony about the Grids is accurate.   See, 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.06.

Because of the ALJ's errors in weighing Dr. Young's opinion and determining

RFC, this case must be remanded.   "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).   See also, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) ("[A] a denial of benefits cannot be sustained where an ALJ failed to articulate the bases of his assessment of a claimant's impairment.")

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Ogden was disabled during the relevant period or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying John N. Ogden's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   January 15, 2016.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

19

20